**In re Mark C. SORRELL, Michelle B. Sorrell, Debtors.**

**No. 06–31720.**

United States Bankruptcy Court,
S.D. Ohio,
Western Division at Dayton.

Jan. 26, 2007.

Pamela D. Rice, Columbus, Ohio, for U.S. Trustee.

Eileen K. Field, Cincinnati, Ohio, for Debtors.

Paul Spaeth, Dayton, Ohio, Chapter 7 Trustee.

**DECISION DENYING MOTION OF THE U.S. TRUSTEE TO DISMISS CHAPTER 7 CASE PURSUANT TO 11 U.S.C. §§ 707(b)(2) AND/OR (b)(3)**

THOMAS F. WALDRON, Bankruptcy Judge.

### *Background*

On July 3, 2006, the Debtors, Mark and Michelle Sorrell, filed a chapter 7 petition (Doc. 1). This chapter 7 case is subject to the provisions of Pub.L. No. 109–8, 119 Stat. 23, the Bankruptcy Abuse Prevention and Consumer Protection Act (the "2005 Act"), more specifically, this case requires consideration of issues presented by 11 U.S.C. § 707(b), commonly referred to as the means test. The court further notes

that this case is limited to the consideration of § 707(b) in the context of a chapter 7 case.[1]

As this court has previously noted:

When Congress enacted the Bankruptcy Reform Act of 1978, Pub.L. No. 95–598, 92 Stat. 2549 (the Code), it repealed and completely replaced the prior bankruptcy legislation (the Bankruptcy Act of 1898, Pub.L. No. 55–171, amended by the Chandler Act of 1938, Pub.L. No. 75–696, 52 Stat. 840). When Congress enacted the 2005 Act, Pub.L. No. 109–8, 119 Stat. 23, it did not repeal or replace the prior bankruptcy legislation (the Code). Instead, Congress merely attached a sidecar (the 2005 Act) to the existing bankruptcy vehicle (the Code). The operation of this oddly constructed vehicle is frequently difficult, depending on whether it is controlled solely by the provisions of the Code, solely by the provisions of the 2005 Act, or, as in this case, by some provisions of the 2005 Act and some provisions of the Code.

*In re Murray*, 350 B.R. 408, 411 (Bankr. S.D.Ohio 2006) (footnote omitted). The issues in this proceeding are controlled solely by the provisions of the 2005 Act.

On August 9, 2006, within the time requirements of § 704(b)(1)[2], the United States Trustee (the "UST") determined that this case was presumed to be an abuse under the means test of § 707(b)(2). The means test sets forth the congressionally determined calculations of a debtor's income and expenses, which, depending upon the result obtained from completing the calculations, presumes the bankruptcy filing to be an abuse of chapter 7 or permits the chapter 7 case to proceed.

As a bankruptcy court recently explained:

Section 707(b)(2) of [the] Bankruptcy Code, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), contains a mechanism called "the means test" for measuring a debtor's presumed ability to repay her debts in the 60 months following the bankruptcy filing. Under the means test, if the debtor's "current monthly income" less specified allowable expenses would permit the debtor to pay over the course of 60 months either (1) $10,000, or (2) 25 percent of her non-priority unsecured debt or $6,000 (whichever is greater), then her case is presumed to be an abuse of Chapter 7. 11 U.S.C. § 707(b)(2)(A)(i). The means test was designed to determine whether the debtor could pay a significant amount to creditors in a Chapter 13 case. The 60–month period in this provision corresponds to the maximum term of a case under Chapter 13 of the Bankruptcy Code, and other provisions of § 707(b)(1) allow a debtor to deduct expenses that would be incurred in a Chapter 13 case from her current monthly income. (footnote omitted)

*In re Randle*, 358 B.R. 360, 361–62 (Bankr. N.D.Ill.2006).

On September 6, 2006, within the time

---

1. The court recognizes that certain provisions of § 707(b)(2) are specifically referred to in § 1325(b)(3).

2. Section 704(b)(1), which was added by the 2005 Act, requires the UST to "review all materials filed by the debtor" and, within 10 days "after the date of the first meeting of creditors, file with the court a statement as to whether the debtor's case would be presumed an abuse under section 707(b)." Under the court's CM/ECF system, this statement appears directly on the docket. In this case, this filing occurred on August 9, 2006. In addition, a separate notice was filed (Doc. 16) and, pursuant to § 704(b)(1)(B), was served upon all creditors.

requirements of § 704(b)(2),[3] the United States Trustee (the "UST") filed the *Motion of the U.S. Trustee to Dismiss Chapter 7 Case Pursuant to 11 U.S.C. §§ 707(b)(2) and/or (b)(3) and Memorandum in Support* (Doc. 19). The Debtors filed a *Response* (Doc. 22) on September 26, 2006. The court issued an *Order Fixing Date for Filing Final Legal Memoranda* (Doc. 24), which provided the parties with an opportunity to suggest issues which would require an evidentiary hearing, but further provided:

> It would appear from these filings that the parties are in agreement that there are no material factual issues in dispute and that the Court can rule on the pending issues as a matter of law. To the extent that either party believes the Court is incorrect in this conclusion, the parties shall, not later than October 12, 2006, complete a filing setting forth the factual disputes which will require an evidentiary hearing.

Neither party suggested any such issues, nor requested an evidentiary hearing. The UST filed a final *Reply to Debtor's Response to Motion of U.S. Trustee to Dismiss* (Doc. 25) and the Debtors filed a final *Legal Memorandum* in support of their position (Doc. 27).

### Positions Of the Parties

The UST's position is that this case is subject to dismissal, since the Debtors failed to correctly calculate certain components of the means test (Form 22A) or have otherwise disposable income sufficient to repay a substantial portion of their debt within a reasonable time. The UST asserts the Debtors erred (1) by excluding, when they should have included, unemployment compensation (Line 9) in calculating current monthly income (CMI) and (2) in including, rather than excluding, payments contractually due (Line 42), and including, rather than excluding, a Local Standard vehicle operating expense (Line 22) in connection with a vehicle the Debtors intend to surrender. The UST further asserts that, even if the presumption of abuse is not established, the issue of the Debtors' ability to pay can be considered as part of "the totality of the circumstances . . . of the [Debtors'] financial situation." It is the position of the UST that when the correct calculations are completed, the Debtors "would have monthly disposable income of $1,184.28 or $71,056.80 over the course of a five-year chapter 13 plan." (Doc. 19).

The Debtors' position is that they have correctly supplied the information required in the means test (Form 22A). The Debtors dispute all of the calculations urged by the UST. The Debtors, whose household consists of three minor children, one employed spouse and one unemployed spouse, assert that their financial situation justifies the relief available in chapter 7. It is the Debtors' position that "[a]n examination of the Debtors' Schedules reflects [a total combined] net . . . monthly income of $4,515.84 (Schedule I), and current monthly expenses of $6,481.80, including a $507.00 monthly child support obligation, which has been temporarily suspended during Mr. Sorrell's period of unemployment (Schedule J). . . . It is clear beyond peradventure that the Debtors in the instant case do not have sufficient income to fund a Chapter 13 plan and repay their debts. Reasonable and necessary expenses exceed current income, and additional vehicle expense is anticipated." (Doc. 22).

---

3. If a debtor's current monthly income [§ 101(10A)] is above the median income for the household size in the state in which she filed, the UST must file the § 707(b) motion within 30 days of the § 704(b)(1) statement.

### Jurisdiction

This court has jurisdiction pursuant to 28 U.S.C. § 1334 and the Standing Order of Reference entered in this District. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

### Issues Presented

1. In determining if abuse is presumed to exist under § 707(b)(2)(A)(i), is unemployment compensation included or excluded in the calculation of current monthly income as defined in § 101(10A)?

2. If the Debtors file a statement of intention to surrender a secured motor vehicle, is it correct for the Debtors to include payments contractually due in calculating the Debtors' average monthly payments under § 707(b)(2)(A)(iii)(I) and is it correct for the Debtors to deduct the Local Standard operating expense for that vehicle under § 707(b)(2)(A)(ii)(I)?

3. If a chapter 7 case of above median income Debtors is determined not to be subject to the presumption of abuse under § 707(b)(2), or that presumption is overcome by special circumstances, is it correct to consider the Debtors' ability to pay under § 707(b)(3) as part of "the totality of the circumstances ... of the debtor's financial situation?"

### Issues Determined

1. In determining if abuse is presumed to exist under § 707(b)(2)(A)(i), unemployment compensation is excluded in the calculation of current monthly income as defined in § 101(10A).

2. If the Debtors file a statement of intention to surrender a secured motor vehicle, it is correct for the Debtors to include payments contractual-

ly due in calculating the Debtors' average monthly payments under § 707(b)(2)(A)(iii)(I) and it is correct for the Debtors to deduct the Local Standard operating expense for that vehicle under § 707(b)(2)(A)(ii)(I).

3. If a chapter 7 case of above median income Debtors is determined not to be subject to the presumption of abuse under § 707(b)(2), or that presumption is overcome by special circumstances, it is correct to consider the Debtors' ability to pay under § 707(b)(3) as part of "the totality of the circumstances ... of the debtor's financial situation."

### Analysis

### Statutory Construction And The 2005 Act Generally

It merely states the obvious to note that the initial court decisions interpreting provisions of the 2005 Act demonstrate that one element legislation should provide—clarity of expression in the choice of language so that interested parties can have predictability in their proceedings—is frequently lacking in significant portions of the 2005 Act. As an example, one court noted:

> This is the first contested motion of its kind considered by this Court under BAPCPA. As a threshold issue, the Court notes that the language in new § 362(c)(3) is very poorly written. It has been noted that the provisions of this new subsection "are, at best, particularly difficult to parse and, at worst, virtually incoherent." *In re Charles*, 332 B.R. 538, 541 (Bankr.S.D.Tex.2005). Judge Thomas Small, former chair of the Advisory Committee on Bankruptcy Rules, has stated that "[i]n an Act in which head-scratching opportunities abound for both attorneys and judges alike, § 362(c)(3)(A) stands out." *In re*

*Paschal,* [337 B.R. 274, 277 (Bankr. E.D.N.C.2006) ]. This Court likewise finds the provisions of § 362(c)(3) to be neither consistent nor coherent.

*In re Baldassaro,* 338 B.R. 178, 182 (Bankr.D.N.H.2006).

The point is not to criticize provisions of the 2005 Act; but, only to note that the lack of clarity of expression in the choice of language in other significant provisions of the 2005 Act is also present in § 707(b) and the related sections at issue in this proceeding. The attempt (necessity) of bankruptcy courts to determine (create) the results intended in the 2005 Act is complicated in such instances.

In their attempts to properly interpret the provisions of the 2005 Act, courts employ canons of statutory construction:

Statutory interpretation is among the most important skills a law student, lawyer, or judge possesses, yet, as Karl Llewellyn pointed out, when it comes to the tools of statutory interpretation, "[t]here are two opposing canons on almost every point."

Karl N. Llewellyn, Remarks on the Theory of Appellate Decision and the Rules or Canons About How Statutes Are to Be Construed, 3 Vand. L.Rev. 395, 401 (1950); or as Richard A. Posner wrote, "For every canon one might bring to bear on a point there is an equal and opposite canon. This is an exaggeration; but what is true is that there is a canon to support every possible result." Richard A Posner, The Federal Courts: Crisis and Reform 276 (1985).

Lance Phillip Timbreza, *The Elusive Comma: The Proper Role of Punctuation in Statutory Interpretation,* 24 QLR 63, 91, fn. 5 (2005).

It is clear that the cabinet containing established canons of statutory construc-

tion holds an array of tools, many appearing capable of completing a given task. The difficult decision is determining which is best suited to yield the appropriate result.

**The Mandate To Apply Plain Meaning**

■ Without attempting a complete compilation of the body of authority concerning statutory construction in connection with bankruptcy legislation, it must be recalled that:

As the United States Supreme Court has instructed courts in examining the provisions of the Bankruptcy Code, "[w]e have stated time and time again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253–254, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992) (citation omitted). That statement is consistent with the United States Supreme Court's principles that statutory interpretation is a holistic endeavor which must begin with the language of the statute itself. Resort to an examination of legislative history is appropriate only to resolve statutory ambiguity, and in the final analysis, such examination must not produce a result demonstratively at odds with the purpose of the legislation. *See Taylor v. Freeland & Kronz,* 503 U.S. 638, 112 S.Ct. 1644, 118 L.Ed.2d 280 (1992); *Pennsylvania Dept. of Public Welfare v. Davenport,* 495 U.S. 552, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990); *Kelly v. Robinson,* 479 U.S. 36, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986). The Sixth Circuit has likewise noted that statutes "must be read in a 'straightforward' and 'commonsense' manner," and that "[w]hen we can discern an unambiguous and plain meaning from the language of a [statute], our task is at an end." *Rogers v. Laurain (In re Laurain),* 113 F.3d 595

(6th Cir.1997) (citations omitted); *see also Bartlik v. United States Dep't of Labor,* 62 F.3d 163 (6th Cir.1995).

*Andersson v. Sec. Fed. Sav. & Loan of Cleveland (In re Andersson),* 209 B.R. 76, 78 (6th Cir. BAP 1997).

The Supreme Court has repeatedly held: The starting point in discerning congressional intent is the existing statutory text, *see Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999), and not the predecessor statutes. It is well established that "when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000) (internal quotation marks omitted) (quoting *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (in turn quoting *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917))).

*Lamie v. U.S. Trustee,* 540 U.S. 526, 534, 124 S.Ct. 1023, 1030, 157 L.Ed.2d 1024 (2004); See also *In re Slusher,* 359 B.R. 290, at 294–95, 2007 WL 118009, at \*3 (Bankr.D.Nev.2007) (summarizing principles of statutory interpretation).

### The Exceptions To The Plain Meaning Debate

■ This body of controlling authority concerning statutory construction in connection with bankruptcy legislation requires a trial court to apply the ordinary meaning of the statutory text, unless one of three recognized exceptions is applicable: the scrivener's error exception, the absurdity doctrine, or the doctrine of constitutional avoidance. These exceptions have been found applicable to various provisions of the 2005 Act.

In applying the scrivener's error exception to provisions of the 2005 Act's exemption provision [11 U.S.C. § 522(p) ], a court stated:

In his opinions, Justice Scalia has occasionally set out the high standard that, in his view, a court must meet before it may substitute legislative intent for legislative enactment. In brief, he requires that two conditions be met before such variance is permissible. First, the plain meaning of the statute under consideration must lack any rational purpose—not just what Congress may have intended, but any plausible congressional purpose. In *Holloway v. United States,* for example, Justice Scalia disagreed with the majority's willingness to reform an otherwise unambiguous statute because he found a "plausible congressional purpose in enacting this language—not what I necessarily think was the real one." *Holloway v. United States,* 526 U.S. 1, 19 n. 2, 119 S.Ct. 966, 143 L.Ed.2d 1 (Scalia, J., dissenting) (1999). Further, he acknowledged, "I search for a plausible purpose because a text without one may represent a 'scrivener's error' that we may properly correct." *Id.* So, according to Justice Scalia, if there is no plausible congressional purpose in the text as written, the statute is a candidate for reformation.

But there must be more. A second element for Justice Scalia is that the intended meaning to be used must be obvious. "The sine qua non of any 'scrivener's error' doctrine, it seems to me, is that the meaning genuinely intended but inadequately expressed must be absolutely clear," he wrote. "[O]therwise we might be rewriting the statute rather than correcting a technical mistake." *United States v. X–Citement*

*Video, Inc.,* 513 U.S. 64, 82, 115 S.Ct. 464, 130 L.Ed.2d 372 (Scalia, J., dissenting) (1994).

\* \* \* \*

This court is, of course, reluctant to say that although Congress enacted X it actually meant Y, and it does not do so lightly. But in this case, the scrivener's error is obvious from the extensive record and from common sense: The intent of Congress is crystal clear, and there is no feasible rationale or policy for enacting what the text of the statute says. Indeed, strictly applying the words of Section 522(p) would actually prevent Congress's goal from being achieved. So it is proper to give the statute the meaning that Congress undeniably intended. (footnotes omitted)

*In re Kane,* 336 B.R. 477, 487–89 (Bankr. D.Nev.2006). Contra *In re McNabb,* 326 B.R. 785 (Bankr.D.Ariz.2005).

In applying the absurdity doctrine to the 2005 Act's provisions governing the dismissal of chapter 11 cases [11 U.S.C. § 1112(b) ], a court stated:

This is a case where the language of BAPCPA passed by Congress tends to defy logic and clash with common sense. This is an example of a specific revision to the Bankruptcy Code, if followed by the Court and applied as Congress seems to intend—i.e., by way of strict construction—would result in an absurd decision and totally unworkable legal precedent. These drafting problems have the potential of bringing the bankruptcy system to a halt while debtors, creditors, and the courts try to figure out just exactly what Congress intended. This Court would add that it appears that the largely overlooked changes to the bankruptcy provisions related to non-consumer cases, such as the case presently before the Court, may some-

times equal the poor crafting of the consumer provisions. Moreover, serious and consequential constitutional questions may be looming on the horizon because of inartful drafting. (footnote omitted)

\* \* \* \* \*

The task of resolving the meaning of a statute begins where all such inquiries must begin: with the language of the statute itself. Unfortunately, here, the Plain Meaning Rule is not appropriate as it would lead to an absurd result. First, if this Court were to require that all the elements of section 1112(b)(4) had to be fulfilled, the Court would doubt very much that a corporate Chapter 11 could ever be dismissed because, for example, this Court can think of no instance where a corporate debtor would have a domestic support obligation. Thus, dismissal could only occur in a Chapter 11 case involving an individual debtor. Moreover, if every element of section 1112(b)(4) was met, the debtor must not only be dismissed, but probably deserves referral to the United States Attorney.

*In re TCR of Denver, LLC,* 338 B.R. 494, 495–96, 499 (Bankr.D.Colo.2006).

In applying the doctrine of constitutional avoidance to provisions of the 2005 Act governing debt relief agencies [11 U.S.C. §§ 526, 527 & 528], a court stated:

If lawyers are placed within the ambit of § 101(4A), the placement conflicts with § 526(d)(2)(A). The conflict would exist because states would be deprived of their ability "to determine and enforce qualifications for the practice of law." If BAPCPA's debt relief agency sections apply to attorneys, it means Congress has taken upon itself the authority to determine the advice attorneys can give their clients and what attorney adver-

tisements must say, thereby infringing on the state's traditional role of regulating attorneys. *See Leis v. Flynt,* 439 U.S. 438, 442, 99 S.Ct. 698, 58 L.Ed.2d 717 (1979) ( "Since the founding of the Republic, the licensing and regulation of lawyers has been left exclusively to the States.")

This view is supported by the doctrine of constitutional avoidance. This doctrine counsels that, in construing a statute for ambiguity, the Court must opt for a construction which avoids grave constitutional questions. *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988). The Court perceives a clear ambiguity in this statute-on one hand it appears to regulate a lawyer's practice; on the other, such regulation is specifically reserved to the states. As outlined above, these sections would be unconstitutional if applied to attorneys. For these reasons, the Court finds §§ 526, 527 and 528 do not apply to attorneys. *Milavetz, Gallop & Milavetz P.A. v. U.S.,* 355 B.R. 758, 768–69 (D.Minn.2006). Contra *Olsen v. Gonzales,* 350 B.R. 906 (D.Or. 2006).

The compelled conclusion is that, absent one of the above exceptions, a court must apply the ordinary meaning of the language as enacted and, thus, adhere to its proper role as a court in our constitutional scheme.

### Legislative History

■ It is necessary to note that the history of the legislative efforts culminating in the 2005 Act is not the same as the legislative history of the 2005 Act. To the extent legislative history of the 2005 Act can be used to resolve any arguable ambiguity in the statutory language, it is of dubious assistance. First, there is no joint conference statement because the 2005 Act did not have a conference committee. See *In re Green,* 348 B.R. 601, 609 (Bankr. M.D.Ga.2006) ("Congress produced no conference report for [the 2005 Act]."). A conference report is generally the best source of legislative history. Similarly, unlike the 1978 Bankruptcy Code, no report of the floor managers exists which might be given the weight of a conference committee report. See *Begier v. IRS,* 496 U.S. 53, 64, 110 S.Ct. 2258, 2266, fn. 5, 110 L.Ed.2d 46 (1990) (citation omitted) ("Because of the absence of a conference and the key roles played by Representative Edwards and his counterpart floor manager Senator DeConcini, we have treated the floor statements on the Bankruptcy Reform Act of 1978 as persuasive evidence of congressional intent"). The versions of the 2005 Act passed by the Senate and House of Representatives were identical and a conference committee was not required. Even assuming it is appropriate to consider the House Judiciary Report (which represents only a view of members of one committee of one house of the federal bicameral legislature) as a source of legislative history, it often contains a mere recitation of the eventually enacted statutory text and adds little, if any, assistance to the court's efforts in determining Congress's intent. See H.R. Rep. 109–31(I), 2005 U.S.C.C.A.N. 88. See also *McNabb,* 326 B.R. at 789 ("Legislative history is virtually useless as an aid to understanding the language and intent of BAPCPA. The section-by-section analysis in the Report of the House Committee on the Judiciary merely provides a gloss of the statutory language of BAPCPA § 322. It does not provide an example of the kind of problem or abuse it was intended to correct, nor a citation to a case whose result it sought to alter.").

■ As the United States Supreme Court has stated:

As we have repeatedly held, the authoritative statement is the statutory text, not the legislative history or any other extrinsic material. Extrinsic materials have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms. Not all extrinsic materials are reliable sources of insight into legislative understandings, however, and legislative history in particular is vulnerable to two serious criticisms. First, legislative history is itself often murky, ambiguous, and contradictory. Judicial investigation of legislative history has a tendency to become, to borrow Judge Leventhal's memorable phrase, an exercise in " 'looking over a crowd and picking out your friends.' " See Wald, Some Observations on the Use of Legislative History in the 1981 Supreme Court Term, 68 Iowa L.Rev. 195, 214 (1983). Second, judicial reliance on legislative materials like committee reports, which are not themselves subject to the requirements of Article I, may give unrepresentative committee members—or, worse yet, unelected staffers and lobbyists—both the power and the incentive to attempt strategic manipulations of legislative history to secure results they were unable to achieve through the statutory text. We need not comment here on whether these problems are sufficiently prevalent to render legislative history inherently unreliable in all circumstances, a point on which Members of this Court have disagreed.

*Exxon Mobil Corp. v. Allapattah Svcs., Inc.*, 545 U.S. 546, 568–69, 125 S.Ct. 2611, 2626, 162 L.Ed.2d 502 (2005).

■ A brief comment is appropriate about the concept "those who can pay, should pay." This concept, which appears in the UST's filings in this case and has found its way into reported decisions, is often offered as evidence of congressional intent to include various funds and exclude various expenses in connection with § 707(b)(2) issues and is suggested as a basis to disregard the actual language of the enacted legislation. See, *e.g., In re Hardacre*, 338 B.R. 718, 725 (Bankr. N.D.Tex.2006) ("Congress's intent with respect to the means test is well known to even the most casual bankruptcy petitioner. The means test was intended to 'ensure that those who can afford to repay some portion of their unsecured debts [be] required to do so.' 151 CONG. REC. S2470 (March 10, 2005).").

First, although it may be correct to recognize the existence of this concept, neither this (nor any similar) phrase appears in the text of the 2005 Act. Second, Congress, in the appropriate exercise of its policy choices in enacting the 2005 Act, determined to exclude or include various funds as a component of what could be paid and what should be paid in a debtor's bankruptcy. The text of the 2005 Act excludes various retirement funds, which are often one of the significant assets of a debtor. Such assets, if included as part of the property of a debtor's estate, could be available for payment to creditors. The 2005 Act rejected case law which prohibits a chapter 13 debtor from claiming the repayment of certain loans as an expense in calculating disposable income and has the effect of reducing the funds available from a debtor for payment to creditors.[4]

---

**4.** See, *e.g., Harshbarger v. Pees (In re Harshbarger)*, 66 F.3d 775 (6th Cir.1995) (Payroll deductions to repay an unsecured loan form an ERISA-qualified profit sharing account were property of the estate and constituted disposable income.). Cf. § 1322(f) ("A plan may not materially alter the terms of a loan described in § 362(b)(19) and any amounts required to repay such loan shall not constitute 'disposable income' under section

Such funds, among others, are now excluded from property of the estate[5] or the 2005 Act provides an exemption for such funds.[6] Finally, to the extent a bankruptcy court's interpretation of the 2005 Act, in connection with charitable contributions, would have resulted in an increase in funds available for payments to creditors, Congress, exercising its permissible policy options, has enacted legislation to prevent such funds from being available for payment to creditors.[7]

The simple point from these examples is to recognize that Congress, of course, can exercise its discretion in determining "those who can pay—should pay"; however, this concept only exists within the confines of the language in the 2005 Act.

■ As the Supreme Court has held:

If Congress enacted into law something different from what it intended, then it should amend the statute to conform it to its intent. "It is beyond our province to rescue Congress from its drafting errors, and to provide for what we might think ... is the preferred result."

*United States v. Granderson,* 511 U.S. 39, 68, 114 S.Ct. 1259, 127 L.Ed.2d 611 (1994) (concurring opinion). This allows both of our branches to adhere to our respected, and respective, constitutional roles. In the meantime, we must determine intent from the statute before us. *Lamie,* 540 U.S. at 542, 124 S.Ct. at 1034.

The balance of this decision focuses on the application of these general principles of statutory construction in the context of the specific provisions of the 2005 Act presented for determination in this proceeding.

## Overview Of 11 U.S.C. § 707(b) Under The 2005 Act

11 U.S.C. § 707(b) governs the dismissal or conversion of a case filed under chapter 7. The 2005 Act significantly changed the provisions of former § 707(b).[8] The first significant change is in the presumption formerly available in § 707(b). Under the Bankruptcy Code prior to the 2005 Act, a presumption existed "in favor of granting the relief requested by the Debtor." This presumption was available to a debtor fil-

1325.''). The court notes that the loans described in § 362(b)(19) includes the type of loan in *Harshbarger.* See also *In re Thompson,* 350 B.R. 770, 775 (Bankr.N.D.Ohio 2006) ("The court reads [§ 1322(f) ] to overrule *In re Harshbarger ....*'').

5. §§ 541(b)(5), (6) and (7).

6. § 522(n).

7. See, *e.g., In re Diagostino,* 347 B.R. 116, 119 (Bankr.N.D.N.Y.2006) (Under § 1325(b)(2), as revised by the 2005 Act, the court held that charitable contributions are not available as a deduction for above median income debtors. The text of § 1325(b)(3), and an amendment proposed to S. 256, both indicate this result "was intentional."); however, Congress recognized the issue and amended the statutory language of § 1325(b)(3) in the Religious Liberty and Charitable Donation Clarification Act of 2006 to allow such deductions. The

amendment became law on December 20, 2006 as Pub.L. 109–439, 120 Stat. 3285.

8. Former Section 707(b) stated: "After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, but not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a *substantial* abuse of the provisions of this chapter. *There shall be a presumption in favor of granting the relief requested by the debtor.* In making a determination whether to dismiss a case under this section, the court may not take into consideration whether a debtor has made, or continues to make, charitable contributions (that meet the definition of 'charitable contribution' under section 548(d)(3)) to any qualified religious or charitable entity or organization (as that term is defined in section 548(d)(4))." (emphasis added)

ing chapter 7, without any language referencing the debtor's family size, total assets, total income, total debts, or other factors, including the ability to pay some, or all, debts in a chapter 13 plan. The presumption could only be overcome, if, upon the motion of the court or the UST, the court determined "[t]he granting of relief would be a *substantial* abuse" of the provision of chapter 7. See former § 707(b) (emphasis added).

This provision was completely rewritten by the 2005 Act's language in current § 707(b) to eliminate both the former presumption in favor of granting the relief requested and to eliminate the word "substantial." These changes, coupled with the additional requirements of current § 707(b), completely change the default for a chapter 7 debtor. Instead of a burden-free entrance, containing a presumption in favor of granting the relief available in a chapter 7 case, except in the circumstance of substantial abuse, now the debtor faces a burden-filled application process, containing, depending upon the information provided, and subject to challenge from an expanded number of entities granted standing to bring such actions, a presumption against the relief available in a chapter 7 case.

In addition to these significant changes, perhaps the most significant change is the congressionally determined mathematical formula in § 707(b) used to calculate whether a debtor's financial circumstances creates a presumption against granting the relief available in a chapter 7 case. This formula applies to debtors, such as the Debtors in this case, whose current monthly income is above the median income for the household size in the state where they filed. See § 707(b)(7)(A) & (B). Current monthly income ("CMI") is a newly defined term in the 2005 Act. See § 101(10A). The Debtors' filings concede

they are above median income Debtors. CMI, even for above median income debtors is, however, a crucial element in the application of the congressionally determined formula calculating whether their financial circumstances create a presumption against the relief available in a chapter 7 case. For a debtor subject to § 707(b)(2), the formula requires that specifically designated standard expenses established by the Internal Revenue Service (National Standards, Local Standards and Other Necessary Expenses), together with certain secured debt and other miscellaneous allowed expenses, be subtracted from CMI.

If, as a result of these various calculations, a debtor has $167 per month in disposable income, the case is presumed an abuse [§ 707(b)(2)(A)(i)(II) ]; or, if a debtor has between $100 $167 in disposable income per month the case may be presumed an abuse, depending on the nonpriority unsecured claims in the case [§ 707(b)(2)(A)(i)(I) ]; however, if a debtor has less than $100 per month in disposable income, the case is not presumed to be an abuse.

If the case is presumed to be an abusive filing, a debtor can, nevertheless, rebut the presumption. In order to rebut the presumption, a debtor must show "special circumstances," which would justify modifications to income and expenses from the § 707(b)(2) formula [§ 707(b)(2)(B)(i-iv) ]. The only examples given are "a serious medical condition" or "a call or order to active duty in the Armed Forces." [§ 707(b)(2)(B)(i) ]. Special circumstances require documentation and a detailed explanation, which all must be attested to under oath [§ 707(b)(2)(B)(ii & iii) ]. Finally, the adjustments for "special circumstances" must bring the debtor's disposable income

below the congressionally determined income thresholds [§ 707(b)(2)(B)(iv) ].

If a debtor's case is not presumed to be an abuse under § 707(b)(2), or if the presumption is overcome by special circumstances, the court shall consider whether the case is nevertheless an abuse because either "the petition was filed in bad faith" or the "totality of the circumstances ... of the debtor's financial situation demonstrates abuse." § 707(b)(3). If a case is determined to be an abuse, the case will be dismissed unless the debtor consents to a conversion to chapter 11 or 13. § 707(b)(1).

**1. Unemployment Compensation Is One of the "Benefits Received Under the Social Security Act" And Is Excluded From Current Monthly Income [§ 101(10A)(B) ]**

█ The initial issue for determination is whether unemployment compensation is one of the "benefits received under the Social Security Act" and, therefore, should be excluded from CMI. It is undisputed the Debtors received unemployment compensation during the applicable period. It is also undisputed that this unemployment compensation was distributed through a program administered by the state of Ohio. The UST argues that unemployment compensation is a benefit of the state of Ohio only.

The court is not aware of any reported decisions on the question, although the issue has been addressed by bankruptcy commentators. See, *e.g.*, *David W. Allard, David E. Grochocinski, Hon. Marci McIvor, and Susan L. Rhiel, Means Testing— Can it Work?*, 061506 ABI–CLE 11 (June 15–18 2006) (summarizing arguments con-

cerning whether unemployment compensation is excluded from CMI). The drafters of Form 22A, which was intended to implement § 707(b) through an official bankruptcy form, were apparently aware of the legal issue and left the decision of whether to include unemployment compensation as income to each debtor.[9]

As previously explained, in determining a debtor's income for purposes of § 707(b)(2), the court does not consider a debtor's income as it exists at the time of filing bankruptcy; but instead calculates what Congress has determined to be a debtor's current monthly income—CMI. CMI is defined in § 101(10A) as:

The term "current monthly income"—

(A) means the average monthly income from all sources that the debtor receives (or in a joint case the debtor and the debtor's spouse receive) without regard to whether such income is taxable income, derived during the 6–month period ending on—

(i) the last day of the calendar month immediately preceding the date of the commencement of the case if the debtor files the schedule of current income required by section 521(a)(1)(B)(ii); or

(ii) the date on which current income is determined by the court for purposes of this title if the debtor does not file the schedule of current income required by section 521(a)(1)(B)(ii); and

(B) includes any amount paid by any entity other than the debtor (or in a joint case the debtor and the debtor's spouse), on a regular basis for the household expenses of the debtor or the debtor's dependents (and in a joint case

---

**9.** See Line 9 of Form 22A (10/06) (Unemployment Compensation. Enter the amount in the appropriate column(s) of line 9. However, if you contend that unemployment compensation received by you or your spouse was a benefit under the Social Security Act, do not list the amount of such compensation in Column A or B, but instead state the amount in the space below[.] )

the debtor's spouse if not otherwise a dependent), *but excludes benefits received under the Social Security Act,* payments to victims of war crimes or crimes against humanity on account of their status as victims of such crimes, and payments to victims of international terrorism (as defined in section 2331 of title 18) or domestic terrorism (as defined in section 2331 of title 18) on account of their status as victims of such terrorism. (emphasis added)

This detailed definition of CMI, with its particularized components, contains Congress's decision to calculate a debtor's current monthly income based on the inclusion or exclusion of funds received by a debtor in the specified six month period prior to filing bankruptcy. In addition to any earnings from employment, CMI includes and excludes funds from other sources. The exclusions from CMI contain the words "benefits received under the Social Security Act." There is no dispute that unemployment compensation constitutes a benefit, the analysis focuses on whether this is one of the "benefits received under the Social Security Act."

A component of this analysis is a brief understanding of unemployment compensation law, which involves both state and federal law, specifically the Social Security Act. States may, but are not required, to enact unemployment compensation law. See *Allard* at Part C (Unemployment Compensation). If, however, a state does enact an unemployment compensation law, it is required to comply with a series of federal mandates. See 42 U.S.C. § 1321 (Eligibility requirements for transfer of funds; reimbursement by State; application; certification; limitation). These mandates are inextricably entwined with the Social Security Act. For example, the Secretary of Labor must certify each state's compliance with the Social Security Act. 42 U.S.C. § 504 (Judicial Review) and 42 U.S.C. § 503 (State laws). To the extent a state law is not in compliance with the Social Security Act, it would be invalid under the Supremacy Clause of the United States Constitution. U.S. Const. art. VI, § 1, cl. 2; See generally *Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). In addition, unemployment compensation is funded, in part, through federal grants [See 42 U.S.C. §§ 1101–1105], which are conditioned on compliance with federal law. See *id.* The Social Security Act even provides for research of the unemployment compensation program, personnel training of state employees and an advisory counsel. 42 U.S.C. § 1106 (Unemployment compensation research program), 1107 (Personnel training) and 1108 (Advisory Counsel on Unemployment Compensation).

The UST recognizes that there is no "definitive guide" to the term "benefits" in the Social Security Act (Doc. 25—page 3); however, the UST urges this court to draw a distinction between direct and indirect payments. The UST argues that direct payments, such as social security retirement payments, would be one of the "benefits received under the Social Security Act", but unemployment compensation, as an indirect benefit from the Social Security Act, would not; however, the plain meaning of the words in § 101(10A)(B) do not contain such a distinction. The applicable text does not speak of "payments", direct, indirect, or otherwise, but instead contains the unambiguously broader term "benefits." [10]

---

**10.** The UST attempts to equate the word benefit and payment by a dictionary definition (Doc. 25—page 3). The use of dictionary definitions has been used by the United State Supreme Court to interpret bankruptcy statutes. See *Rousey v. Jacoway,* 544 U.S. 320,

It is correct that the actual payments to eligible unemployed workers, such as the Debtors, are administered by the individual states. See, *e.g.*, Ohio Revised Code § 4141.01, *et seq.* However, it is undisputed that unemployment compensation exists, including a component of any funding of such a state program, only if individual states comply with the Social Security Act. It is also clear that, although there is a number of differing state programs, which operate through a variety of state distribution criteria, the common funding source and common control component of all unemployment compensation programs is the Social Security Act. An overall consideration of the Social Security Act and unemployment compensation provides support for the conclusion that unemployment compensation is one of the "benefits received under the Social Security Act."

Additionally, the Supreme Court has previously addressed the purpose of the Social Security Act and, in the process, recognized unemployment compensation as one of its benefits:

> The purpose of the [Social Security] Act was to give prompt if only partial replacement of wages to the unemployed, to enable workers "to tide themselves over, until they get back to their old work or find other employment, without having to resort to relief." Unemployment benefits provide cash to a newly unemployed worker "at a time when otherwise he would have nothing to spend," serving to maintain the recipient at sub-

sistence levels without the necessity of his turning to welfare or private charity. (emphasis added; footnotes omitted)

*California Dept. of Human Resources Development v. Java*, 402 U.S. 121, 131–32, 91 S.Ct. 1347, 1354, 28 L.Ed.2d 666 (1971) (emphasis added). This recognition provides further support for the conclusion that unemployment compensation is one of the "benefits received under the Social Security Act."

An examination of the provisions of the 2005 Act contains other references to the Social Security Act, but only to various specific provisions of the Social Security Act. In § 362(b)(2), the exceptions to the automatic stay in connection with domestic relations issues were expanded:

> (b) The filing of a petition under section 301, 302, or 303 of this title, or of an application under section 5(a)(3) of the Securities Investor Protection Act of 1970, does not operate as a stay—
>
> * * * * *
>
> (2) under subsection (a)—
>
> * * * * *
>
> (D) of the withholding, suspension, or restriction of a driver's license, a professional or occupational license, or a recreational license, under State law, *as specified in section 466(a)(16) of the Social Security Act*;
>
> (E) of the reporting of overdue support owed by a parent to any consumer re-

326, 125 S.Ct. 1561, 1566, 161 L.Ed.2d 563 (2005). The UST cites Webster's New Word Dictionary (2nd Ed.1986), which refers to benefits, at least in the context of the Social Security Act, as "payments." However, Black's Law Dictionary 5th Ed. (1979), page 143 refers to "[f]inancial assistance received in time of ... unemployment, etc. either from insurance or public programs such as social security." In the court's view, the term "financial assistance" is the better one in that it

is not simply the actual check or electronic transfer from a state administered program, but is instead the funds themselves, which come, in part, from the Social Security Act. Moreover, all the funds received, regardless of the source, are subject to mandatory federal oversight. The court finds no principled basis to distinguish between direct and indirect payments as one of the "benefits received under the Social Security Act."

porting agency *as specified in section 466(a)(7) of the Social Security Act*;

(F) of the interception of a tax refund, *as specified in sections 464 and 466(a)(3) of the Social Security Act* or under an analogous State law; or

(G) of the enforcement of a medical obligation, *as specified under title IV of the Social Security Act[.]* (emphasis added)

References to specific provisions of the Social Security Act can also be found in § 704(c)(1)(A)(i):

In a case described in subsection (a)(10) to which subsection (a)(10) applies, the trustee shall—

(A)(i) provide written notice to the holder of the claim described in subsection (a)(10) of such claim and of the right of such holder to use the services of the State child support enforcement agency *established under sections 464 and 466 of the Social Security Act* for the State in which such holder resides, for assistance in collecting child support during and after the case under this title[.] (emphasis added)

The same reference can also be found in § 1302(d)(1)(A)(i).

 In all of these examples, Congress did not choose the broad term the "Social Security Act," which is the language chosen in connection with CMI; but, rather, selected specific provisions of the Social Security Act. The CMI definition does not contain any congressionally limited specific provisions of the Social Security Act. It is appropriate to conclude that when Congress wished to limit the applicability of the Social Security Act, it did so by reference to specific sections. Canons of statutory construction approved by the Supreme Court recognize that congressional enactments which contain particular language in one section of a statute, but omit such particularity in another section, reflect Congress's intention and purpose in such disparate use. *BFP v. Resolution Trust Corp.,* 511 U.S. 531, 537, 114 S.Ct. 1757, 1761, 128 L.Ed.2d 556 (1994), *citing Chicago v. Environmental Defense Fund,* 511 U.S. 328, 338, 114 S.Ct. 1588, 1593, 128 L.Ed.2d 302 (1994). See also *Keene Corp. v. United States,* 508 U.S. 200, 208, 113 S.Ct. 2035, 2040, 124 L.Ed.2d 118 (1993).

A comparison of the specificity which Congress chose in referring to limited, specific provisions of the Social Security Act in §§ 362(b)(2)(D), (E), (F) and (G), 704(c)(1)(A)(i) and 1302(d)(1)(A)(i) as opposed to Congress's choice in referring to the unlimited, general provisions of the entire Social Security Act in § 101(10A)(B) provides further support for the conclusion that unemployment compensation is one of the "benefits received under the Social Security Act."

In summary, in consideration of the text of various relevant portions of the Social Security Act, United States Supreme Court language, and a comparison with other statutory text of the 2005 Act, which reference specific provisions of the Social Security Act, the court holds that unemployment compensation is one of the "benefits under the Social Security Act." Accordingly, the $1,295.00 listed by the Debtors on line 9 of their Form 22A is correctly excluded from CMI. As a result of this exclusion, and the absence of any further dispute between the parties concerning any other aspect of the CMI calculation, the court determines the Debtors' CMI, as calculated on the Debtors' Form 22A (Doc. 1), is $7,606.97.

**2. Section 707(b)(2)(A)(iii)(I) Allows A Debtor To Deduct A Vehicle's Monthly Secured Debt Payment And § 707(b)(2)(A)(ii)(I) Allows A Local Standard Operating Expense, Even If The Vehicle May Be Surrendered During The Chapter 7 Case**

 Once CMI is calculated, the court must subtract the expenses under the

§ 707(b)(2) formula to determine if the Debtors' disposable income is sufficient for the court to presume this case is an abusive filing. The parties' only dispute concerns expense deductions for a vehicle, a Ford Fusion, that the Debtors intend to surrender during the chapter 7 case.

On line 42 of Form 22A, the Debtors deducted a monthly payment of $489.84 as an amount, in accordance with § 707(b)(2)(A)(iii)(I), which is "scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition; and ... divided by 60." (Doc. 1). In addition, on line 22 of the Debtors' Form 22A, the Debtors deducted $343.00 as the Local Standard for a monthly vehicle operation expense where a debtor has two or more vehicles.[11]

On September 3, 2006, in the Debtors' *Statement of Intention* (Doc. 4), the Debtors indicated the vehicle was to be surrendered. The court has no evidence in the record of whether the vehicle was ever surrendered; however, Ford Motor Credit was granted relief from stay, by default, on the vehicle on August 24, 2006 (Doc. 18). The parties dispute whether the secured debt on the vehicle are proper deductions under § 707(b)(2)(A)(iii)(I) when the vehicle is to be surrendered. The UST argues that only payments which are to be paid during the 60 month period post-filing can be deducted. Since the vehicle was to be surrendered, the UST asserts the vehicle payments cannot be deducted.

Although there could be an instinctive assent to the position that there should not be an allowed deduction for a payment which may not be made, this argument rests on the premise that Congress's choice of language in the applicable sections cannot be accorded its plain meaning. This premise is not supported by any recognized exception to the mandatory cannon of according Congressional enactments their plain meaning. To the contrary, Congress, in its policy choices, is certainly entitled to eliminate the delay and uncertainty of a court determined vehicle-by-vehicle, case-by-case approach to whether a particular vehicle will be reaffirmed, redeemed or surrendered. Congress can choose to eliminate any analysis of a debtor's initial decisions concerning the monthly payments in connection with any reaffirmation or redemption, total amount due, the interest rate or other aspects of the modification of secured debt and reconsideration of any such determinations, including surrender, at various points in the subsequent progress of the case. Congress eliminated such discretionary determinations by its choice of language in connection with these mandated deductions.

This result is not surprising in that the overall means test of § 707(b)(2) is a formulaic attempt by Congress to establish the calculations used to determine a presumption of abuse with a minimum, if any, exercise of discretion. The formula, although time consuming in proceeding through its various subsections, simply employs pre-determined expenses and subtracts these expenses from another formula which calculates income (CMI). Section 707(b)(2), unlike § 707(b)(3), provides very limited judicial discretion.

The parties do not dispute that payments were contractually due under applicable nonbankruptcy law prior to filing. The filing of the chapter 7, by itself, does not change that fact. *Randle*, 358 B.R. at 364–65. The intent to surrender a vehicle, by itself, also does not change the contrac-

---

11. The UST uses $260 for line 22 which was the Local Standard monthly vehicle operation expense for a debtor with one vehicle at the time this chapter 7 case was filed (Doc. 19).

tual obligations. *In re Simmons*, 357 B.R. 480, 485–86 (Bankr.N.D.Ohio 2006).

The UST argues the words "scheduled as" are ambiguous and do not refer to payments scheduled under a contractual agreement, but instead to a secured debt listed on the Debtors' bankruptcy schedules and other filings. The UST argues that "scheduled as" in § 707(b)(2)(A)(iii)(I) has the same meaning as the phrase "scheduled as" in § 1111(a) ("A proof of claim or interest is deemed filed ... for any claim of interest that appears in the schedules filed ... except as claim of interest that is scheduled as disputed, contingent or unliquidated."). As a corollary to that argument, the UST further argues by looking at all of the Debtors' filings, including the *Statement of Intention*, the Debtors are indicating the secured vehicle is being surrendered, and therefore there is no contractually amount due over the next 60 months. The court notes that the use of the words "scheduled as", in the context of § 1111(a), is unambiguous in its plain language. In the context of § 707(b)(2)(A)(iii), the words "scheduled as" are used in a completely different context and, unlike § 1111(a), do not refer to the bankruptcy schedules.

When considering the word "scheduled" as used in the Bankruptcy Code (as amended by the 2005 Act), a similar conclusion can be drawn. An excellent discussion of this issue is contained in *In re Nockerts*, 357 B.R. 497, 501–03 (Bankr. E.D.Wis.2006). The *Nockerts* court concluded that the word "scheduled" may or may not refer to the bankruptcy schedules. The court noted that in two instances in the Bankruptcy Code (as amended by the 2005 Act), the word "scheduled" refers to the bankruptcy schedules: § 523(a)(3), which addresses when certain debts not listed or scheduled are nondischargeable; and § 554(c), which addresses when prop-

erty is deemed abandoned. Similar to the use of the phrase "scheduled as" in § 1111(a), the meaning of the word "scheduled" in these sections can only refer to the bankruptcy schedules. However, in § 524(k)(3)(H)(ii), which addresses reaffirmation agreements, the term "scheduled" is referring to a repayment schedule. In § 1326(a)(1)(B), the term "scheduled" refers to pre-confirmation lease payments. In an analysis of the use of the word "scheduled" within the surrounding language of these two examples, the word "scheduled" does not refer to the bankruptcy schedules. Sections 524(k)(3)(H)(ii) and 1326(a)(1)(B) has three commonalities with § 707(b)(2)(A)(iii)(I): 1) all the provisions were added in the 2005 Act; 2) all the provisions address circumstances where a debtor scheduled payments in a lease or contract and 3) those sections do not refer to the bankruptcy schedules.

Secondly, even if the court were to adopt the UST's reasoning concerning the meaning of either "scheduled as" or "scheduled", a debtor's statement of intention is not a schedule. See *In re Randle*, 358 B.R. at 365–66 ("There is no bankruptcy schedule that requires the debtor to list 'all amounts due to secured creditors in each of the 60 months following the date of the petition' So, there is no bankruptcy schedule to which § 707(b)(2)(A)(iii) could refer."). The Bankruptcy Code, both before and after the 2005 Act, distinguished, in plain language, between a schedule and a statement of intention. Cf. § 521(a)(1)(B) and § 521(a)(2). The schedules, specifically schedule D, indicate the Debtors have a secured debt on a Ford Fusion. The debt is not contingent or disputed in any manner. By scheduling these debts, the Debtors are conceding what they owe their creditors as of the petition date. See *In re Jorczak*, 314 B.R. 474, 482 (Bankr.D.Conn.2004) (the scheduling of a debt is a judicial admission by the debtor).

Finally, the UST argues that certain expenses can be analyzed as "forward looking" for purposes of § 707(b)(2) and the court should consider whether, in the future, the vehicle may be surrendered. The UST states in its brief that "[a]lthough certain expenses, such as housing and utilities payments might in some cases be calculated based on constant historical amounts because there is no reason to believe such expenses will change in the future, the wording of § 707(b)(2) does not expressly require expense calculations to be historical in nature . . ." (Doc. 25, page 9). The court agrees that § 707(b)(2) requires adherence to congressionally defined expenses; however, the reality is that housing and utility expenses do change. In fact, the expense allowances for these items are periodically adjusted upward even in figures referenced by the UST. In a debtor's actual budget, these post-petition changes can be dramatic and sudden, but this new reality would not be reflected in the UST's position concerning permissible expenses under § 707(b)(2). As noted by another reported decision, § 707(b)(2)(A)(ii)(I) refers to expenses "as in effect on *the date of the order for relief*." *Nockerts*, 357 B.R. at 504–05 (emphasis added).[12]

Thus, the UST is seeking income and most expenses (National Standards, Local Standards and Other Necessary Expenses) be considered "frozen figures" on the date of the order for relief, but, in the particular case of secured debt payments, urges an opposite position—that the court should look into the future. In an attempt to apply all of the § 707(b)(2) formula in a consistent manner, such an argument appears inconsistent and, more importantly, not justified by the plain meaning of the language in § 707(b)(2)(A)(iii)(I) which requires a calculation based upon "the 60 months following the date of the petition." Section 707(b)(2)(A)(iii)(I) does not reference any post-petition eventuality, which would alter the expense amount for purposes of the § 707(b)(2) formula, to adjust that calculation, including an intention to surrender secured property.[13]

The court also notes that this result does not render the obligation of the UST under § 704 to review "all materials by the debtor" surplusage. The *Statement of Intention* and other filings beyond a debtor's

---

**12.** Indeed, Official Form 22A refers to the website of the United States Trustee to find some of these expense figures. The web site currently instructs that the expense figures apply only to "Cases Filed Between October 1, 2006, and January 31, 2007, Inclusive." This information can be found at http://www.usdoj.gov/ust/eo/bapcpa/20061001/meanstesting.htm.

**13.** Nevertheless, the UST argues an additional example of a "forward looking" expense is § 707(b)(2)(A)(iii)(II), which states "any additional payments to secured creditors necessary for the debtor, in filing a plan under chapter 13 of this title, to maintain possession of the debtor's primary residence, motor vehicle, or other property necessary for the support of the debtor and the debtor's dependents, that serves as collateral for secured debts[.]" Even if somehow § 707(b)(2)(A)(iii)(II) was a "forward looking" subsection of § 707(b)(2), it refers to secured payments needed to maintain possession of secured property for a chapter 13 plan. The contrast with § 707(b)(2)(A)(iii)(I) is stark. Section § 707(b)(2)(A)(iii)(I) does not concern itself with whether a payment is needed to maintain possession into the future or otherwise. It is either contractually due in monthly payments over a 60 month period or it is not. That fact can be readily determined immediately at filing and, as explained, should be determined in that manner. Cf. *Randle*, 358 B.R. at 365–66 ("Generalized descriptions of the nature of the expenses under the means test are not persuasive given the specific statutory language in § 707(b)(2)(A)(iii) dictating that the debtor deduct amounts contractually due on her secured debt-period.").

schedules would remain relevant for purposes of § 707(b)(3) analysis. See also *Randle*, 358 B.R. at 365–66 ("[T]he Trustee's duty to review documents has nothing to do with proper interpretation of § 707(b)(2)(A)(iii).").

Finally, the UST argues the result reached today damages § 707(b)(2) as a "congressionally-imposed bright line test" and also could cause a debtor to seek to defeat the means test by purchasing secured collateral pre-petition and surrendering the property shortly after filing (Doc. 25—page 5, fn. 8).

Concerning the first argument, this court is obligated to apply § 707(b)(2) as it is written and not what may be thought "is the preferred result." *Granderson*, 511 U.S. at 68, 114 S.Ct. at 1275. Although this court attempts to apply an appropriate analysis to the statutory language, if the statute as enacted is not achieving its intended result, this court is not the appropriate forum for correction. *Lamie*, 540 U.S. at 538, 124 S.Ct. at 1032 ("Our unwillingness to soften the import of Congress's chosen words even if we believe the words lead to a harsh outcome is longstanding. It results from 'deference to the supremacy of the Legislature, as well as recognition that Congressmen typically vote on the language of a bill.' "; citation omitted).[14]

As for a debtor manipulating the means test by purchasing secured collateral simply to avoid the § 707(b)(2) presumption, such a prepetition manipulation could be an appropriate component of an analysis under § 707(b)(3).

The court concludes the $489.84 secured debt expense for the Ford Fusion is properly deducted as an amount "scheduled as contractually due secured creditors in each month of the 60 months following the date of the petition[.]" [15] In addition, since the "date of the order for relief" is the relevant date for purposes of § 707(b)(2)(A)(ii)(I), the Local Standard vehicle operating expense for two vehicles of $343.00 is also correct.[16] Since, the Debtors' overall disposable income is a negative figure, they lack the necessary disposable income to trigger the abuse thresholds of § 707(b)(2)(A)(i).[17] The motion to dismiss this case pursuant to § 707(b)(2) is **DENIED**.

3. **If A Chapter 7 Case Of Above Median Income Debtors Is Determined Not To Be Subject To The Presumption Of Abuse Under § 707(b)(2), Or That Presumption Is Overcome By Special Circumstances, It Is Correct To Consider The Debtors' Ability To Pay Under § 707(b)(3) As Part Of "The Totality Of The Circumstances … Of The Debtor's Financial Situation."**

The court has determined there is no presumption of abuse pursuant

---

**14.** See footnote 7—Congressional correction to § 1325(b)(3).

**15.** The court acknowledges the UST's citations to reported decisions to the contrary and respectfully disagrees with these decisions. See, *e.g.*, *In re Skaggs*, 349 B.R. 594 (Bankr.E.D.Mo.2006) (vehicle intended to be surrendered cannot be deducted as a § 707(b)(2)(A)(iii)(I) expense). See also *In re Singletary*, 354 B.R. 455 (Bankr.S.D.Tex. 2006) (vehicle surrendered by the date of a § 707(b) motion cannot be deducted as a § 707(b)(2)(A)(iii)(I) expense).

**16.** The Local Standards are found in the Internal Revenue Manual 5.15.1.9 (effective 5–1–2004).

**17.** As noted, the court finds the $7,606.97 is the Debtors' CMI. The UST included $49.50 that the Debtors failed to claim for the hypothetical chapter 13 administrative fee. Therefore, in subtracting all allowed monthly expenses of $8,290.53, the Debtors' disposable monthly income, for purposes of § 707(b)(2), is negative $683.56.

to § 707(b)(2); however, the UST argues this case remains subject to dismissal or conversion pursuant to § 707(b)(3), which states:

> In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in subparagraph (A)(i) of such paragraph does not arise or is rebutted, the court shall consider—
>
>> (A) whether the debtor filed the petition in bad faith; or
>>
>> (B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.

The court notes that a recent decision, *In re Mestemaker*, 359 B.R. 849, 2007 WL 79306 (Bankr.N.D.Ohio 2007) contains a detailed analysis of § 707(b)(3) in connection with Sixth Circuit decisions. This court believes it will add little to this opinion to recite, in different language, the holdings in that case, which include a determination that:

> The plain meaning of the phrase "debtor's financial situation" must include a debtor's actual income and expenses, since such information is the starting point for any analysis of an individual's financial situation. There is no provision in § 707(b) stating that the means test is the only method through which a court may determine whether there is abuse based on a debtor's ability to pay. Rather, the plain language of § 707(b)(3), read in conjunction with § 707(b)(1) and (2), is clear and compels a conclusion that a court must consider a debtor's actual debt-paying ability in ruling on a motion to dismiss based on abuse where the presumption does not arise or is rebutted.

Id. at *4.

It is important to recognize the parties agreed that there are no factual issues and the UST's *Motion* (Doc. 19) can be resolved as a matter of law.[18] In the filings of the UST, the only argument given is that the Debtors have the ability to pay—i.e. fund a chapter 13 plan. The UST raises no other factors in this case such as, but not limited to, bad faith, rejection of a personal services contract, prepetition manipulation of the means test, hiding assets, incorrect schedules, future inheritances or income, future business opportunities, or, significantly for this proceeding, any disagreement with any of the amounts listed on the Debtors' schedules I and J. The court notes that a review of all filed information also fails to disclose any concern about such factors.

A review of all filed information, specifically, the unchallenged Schedules I & J (Doc. 1), establish, for purposes of this proceeding, the debtors' actual income and expenses.

The amount of income on Schedule I is $4,515.84, which includes, under the § 707(b)(3) analysis, the husband Debtor's unemployment compensation of $1,295.00, as the UST argued should be included, although the court determined unemployment compensation should be excluded under the § 707(b)(2) analysis.

The amount of expenses on Schedule J is $6,481.80, which excludes, under the § 707(b)(3) analysis, the secured debt payment of $489.84 on the vehicle which is proposed to be surrendered, as the UST argued should be excluded, although the court determined the secured debt payment of $489.84 on the vehicle which is

---

**18.** See *Order Fixing Date For Filing Final Legal Memoranda* (Doc. 24—October 2, 2006).

proposed to be surrendered should be included under the § 707(b)(2) analysis. Additionally, whether the court considers the Debtors' transportation expense listed as $400.00 on schedule J or the UST's proposed amount of $260.00 (a $140.00 difference, reducing the total adjusted expenses to $6,341.80), it is clear that the Debtors do not have available income allowing them to have an ability to repay their debt. [Total monthly income $4,515.84; total monthly adjusted expenses—$6,341.80].[19]

Even using all the amounts urged by the UST and recalling that in this proceeding both parties agreed that this case did not require an evidentiary hearing, and the issue for determination was, as a matter of law, whether the Debtors had the ability to pay, the court determines that the totality of the circumstances of the Debtors' financial situation, under § 707(b)(3), does not establish that they have any ability to repay their debt and granting them the relief requested would not be an abuse of the relief available under the provisions of chapter 7. The *Motion* (Doc. 19) to dismiss pursuant to § 707(b)(3) is **DENIED.**

### Conclusion

All relief requested in the *Motion of the U.S. Trustee to Dismiss Chapter 7 Case Pursuant to 11 U.S.C. §§ 707(b)(2) and/or (b)(3) and Memorandum in Support* (Doc. 19) is **DENIED.**

**19.** This remains true even if the deduction for the $507.00 monthly child support obligation, which was suspended during the debtor husband's unemployment, is removed as an expense. The Debtors would still have a substantial shortfall in their monthly budget. The monthly income of $4,515.84 minus the adjusted monthly expenses of $5,974.80 equals negative $1,458.96 per month. See Doc. 1. The court notes that a focused examination of a debtor's income and expenses frequently results in a determination that a debtor lacks sufficient income to pay present expenses, which, not surprisingly, contributes to the decision to file a chapter 7 case.